UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF MICHIGAN

GARDNER, ROBERT,

    Plaintiff,

v.

BOARD OF TRUSTEES OF
MICHIGAN STATE UNIVERSITY,
and LOU ANNA K. SIMON,

    Defendants.

Case No. 1:12-cv-01018

Hon. Paul L. Maloney
U.S. District Judge

_____

Robert Gardner
Pro Se
1625 Grovernburg Rd.
Holt, MI 48842

Michael J. Kiley (P26387)
Attorney for Defendants
426 Auditorium Rd., Room 494
East Lansing, MI 48824
(517) 353-3530
kiley@msu.edu

_____ /

**DEFENDANT UNIVERSITY'S BRIEF IN SUPPORT
OF MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

I. CONCISE STATEMENT OF REASONS ..................................................................1

II. STATEMENT OF FACTS ............................................................................................2

    A. Background ..........................................................................................................2

    B. 2009 Graduate School Application ......................................................................3

    C. Pokagon Band Proposal .......................................................................................3

    D. Outreach Specialist Position ................................................................................4

    E. Litigation Proceedings .........................................................................................5

III. ARGUMENT ................................................................................................................7

    A. Standard of Review ..............................................................................................7

    B. Plaintiff Cannot Sustain His Retaliation Claims ..................................................7

    C. The Retaliation Claims Under Title VII and the Elliott-Larsen Act Fail ............8

    D. Defendant MSU Is Not A "Person" Under the Civil Rights Act .........................9

    E. Plaintiff Cannot Sustain A Claim Of Tortious Interference With Contract .........9

    F. No Contract Was Breached ................................................................................10

    G. State FOIA Claims Are Best Left To State Courts ............................................10

    H. The Untimely 2009 Graduate Study Admissions Claim Fails On The Merits ......10

IV. RELIEF REQUESTED ...............................................................................................12

# INDEX OF AUTHORITIES

Michigan Cases

*BPS Clinical Laboratories v. Blue Cross & Blue Shield of Mich. (On Remand)*, 217 Mich. App. 687; 552 N.W.2d 919 (1996) ........ 9

*Garg v Macomb County Community Mental Health,* 472 Mich. 263; 696 N.W. 2d 646 (2005) ........ 11

*Magee v. Daimler-Chrysler Corp.,* 472 Mich. 108; 693 N.W.2d 166 (2005) ........ 11

*Romska v. Opper*, 234 Mich. App. 512; 594 N.W.2d 853 (1999) ........ 10

Federal Cases

*Carroll v. Wilkerson*, 782 F.2d 44 (6th Cir. 1986) ........ 11

*Humenny v. Genex Corp.*, 390 F3d 901, 906 (6th Cir. 2004) ........ 8

*Nguyen v. City of Cleveland*, 229 F.3d 559 (6th Cir. 2000) ........ 7

*Wilson v. Garcia,* 471 U.S. 261; 105 S.Ct. 1938, 85 L.Ed.2d 254 (1985) ........ 11

Rules and Statutes

42 U.S.C. § 1983 and § 1985 ........ 6, 9

42 U.S.C. § 2000e-3(a) ........ 7, 8

M.C.L. 37.2101 *et seq.* ........ 7, 8, 11

M.C.L. 600.1410 *et seq.* ........ 10

M.C.L. 600.5805(10) ........ 11

I.  **CONCISE STATEMENT OF REASONS**

Plaintiff Robert Gardner's 2012 lawsuit against Michigan State University ("MSU") and its President, Lou Anna Simon, Ph.D., mirrors his 2011 civil suit against the same parties. The actions reflect the tenor and substance of Mr. Gardner precedent claims and complaints over the years. He alleges that for decades MSU administrators have conspired to mistreat him, in retaliation for his complaints of ill treatment. As in the past, his claims feature putative contract rights. In state court, in 1999, Mr. Gardner asserted unspecified contract rights while unsuccessfully defending against a criminal trespass charge stemming from his refusal to leave his office when his academic program was terminated. In his 2011 suit, Mr. Gardner alleged that MSU had breached his asserted employment contracts. The Court found that assertion wanting. In the present case, Plaintiff alleges that MSU breached an employment contract. Mr. Gardner was last associated with MSU in December, 1998. The parties do not have contractual relations.

Plaintiff also seeks to breathe life into the legally moribund claim that he was unlawfully denied admission to graduate studies at MSU in 2009. While he invokes characterizations that carry provocative legal meaning, his constructions lack factual support. They are in the nature of rhetorical conjectures. Plaintiff's graduate school application was denied, in March, 2009, for good and legally proper reasons. The tardy claim utterly fails.

In 2011, Plaintiff prepared a draft feasibility study related to a proposed farm project for which the Pokagon Band of the Potawatomy Tribe could have sought federal government grant funds. He exchanged emails with an MSU faculty member on the subject. The Pokagon Band did not opt to work with Mr. Gardner. The talks and the feasibility proposal were not subject to a contract. There was no underlying impropriety. That same year, Plaintiff was among ten unsuccessful candidates for an Outreach Specialist position within MSU's Native American

1

Institute ("NAI"). Mr. Gardner does not claim that he was more qualified than any other applicant. He cannot claim that the decision-makers knew of his past complaint. He does not claim that other applicants had either failing graduate education experiences or criminal conviction arising from conduct while on the MSU campus.

## II. STATEMENT OF FACTS

### A. Background

Mr. Gardner's first complaint of conspiracy within MSU dates to 1985. On November 10, 1993, Mr. Gardner wrote of his grievance addressed to the "interaction of the Animal Science Department with the Ag. Economic Department in thwarting my career progress. This has been a consistent problem for me and my wife for eight years." Gardner Memo, Exhibit 1.[1] As a long time doctoral candidate, in June, 1998, Mr. Gardner was urged to complete his thesis without further delay. Prof. Crawford memo, Exhibit 2. In November, 1998, then Circuit Judge James R. Giddings entered an order disposing of Mr. Gardner's civil action against MSU. Exhibit 3. On January 7, 1999, Mr. Gardner reportedly refused to relinquish his office space upon the termination of his program, and he was arrested for criminal trespass. Memo to MSU President McPherson, Exhibit 4. A trial ensured. Mr. Gardner was found guilty of criminal trespass and was banned from the MSU campus. Gardner Dep. Tr. 12-13, Exhibit 5.[2]

Mr. Gardner corrected himself and explained the campus ban and fine the court imposed.

---

[1] Defense counsel certifies that Exhibits 1-2 and 4- 6, which are not drawn from the discovery record in this matter, are true copies of documents transmitted in the course of other past proceedings involving these same parties.

[2] Plaintiff's testimony, in which he ultimately reported being fined and banned from campus for six months, reveals how fixed he is to idea that MSU owes him a job:
    Q.    And what was the finding of the court?
    A.    That I was guilty.
    Q.    What was the sentence?
    A.    I was to move on, that the university would set up some jobs for me and - -

2

Dep Tr, p 13, lines 9-23, Exhibit 5.[3]

While Plaintiff has been an applicant for jobs and graduate study at MSU over the years, he has had no institutional affiliation since December, 1998.

### B. 2009 Graduate School Application

In early 2009, Plaintiff applied for admission to an MSU graduate program. On March 25, 2009, Professor Scott Loveridge issued Mr. Gardner a notice of denial. Letter, Bates p. 3, Exhibit 7. Prof. Loveridge had recommended against admission due to specific deficiencies in past academic performance and a concern over professionalism arising from Mr. Gardner's pugnacious correspondence to the editor of a scholarly journal, the *Review of Agricultural Economics*. See memo and related material, Bates pp. 41-46, Exhibit 8.

### C. Pokagon Band Proposal

In 2011, about a dozen people gathered at MSU's campus for lunch to discuss prospects for community outreach projects that would appeal to the Pokagon Band of the Potawatomy Tribe, and may garner support from the Bureau of Indian Affairs ("BIA"). Mr. Gardner and Professor Gordon Henry, Director of the NAI at MSU, were both among the attendees. Affidavit of Gordon Henry, ¶ 2, Exhibit 8. Later, acting on his own or with a former MSU faculty member who had retired in 2008, James Oehmke, Ph.D., Plaintiff drafted a feasibility study for a proposed agriculture project. *Id*, ¶ 3, Henry Affidavit. Prof. Henry was not further involved in the initiative. *Id*. He had been negatively impressed with the content of an unrelated grant proposal Mr. Gardner had prepared, and he was troubled by Plaintiff's presuming to speak for MSU in the course of his dealing with the BIA. *Id*, ¶ 4.

---

[3] In 2002, Mr. Gardner became embroiled in a dispute with an alliance of student groups. The alliance notified Mr. Gardner to cease harassing the member groups. Letter notice, August 19, 2002, Exhibit 6. The letter notice was among papers Plaintiff provided in response to Defendants' Request for Documents.

3

According to Mr. Gardner, "Plaintiff had [an] expectancy that he would receive employment financing from the Bureau of Indian Affairs if he established a written agreement with a tribe." Plaintiff's Response to Defendant [Simon's] motion for dismissal or for Summary Judgment, p. 11 (ECF No. 90). No agreement was produced in discovery. Defendants know of no such agreement.

Regarding the present action, Plaintiff explained, "Plaintiff alleges [that Defendants] interfered with a research contract he and his MSU Ph.D. supervising professor, James Oehmke, had with the Pokagon Tribe and [BIA] that was to enhance his Ph.D. endeavors and help the Pokagon people." [Plaintiff's] Memorandum of Points and Authorities, p. 1 (ECF No. 33). Had Dr. Oehmke been an active status MSU faculty member, he would *not* have had authority to enter into contracts on MSU's behalf. Hanson Affidavit, ¶ 4, Exhibit 9. Retiree Oehmke did not play a "supervising" or other role for MSU in 2011.

In August, 2011, the Pokagon Band Board of Directors authorized its chief officer to seek $22,000 in federal grant funds for "professional consultant services" to develop a proposed agriculture business project. See Resolution, Exhibit 10 to Plaintiff's Response to Defendant [Simon's] Motion for Dismissal or for Summary Judgment (ECF No. 89). In July and October, 2012, the Pokagon Band released reports on the proposed project prepared by staff from MSU's Strategic Marketing Institute; see Reports released by Defendant MSU in discovery, Exhibits 10 and 11. Plaintiff was not associated with the Strategic Marketing Institute.

**D. Outreach Specialist Position**

Defendant MSU's NAI posted a position for an Outreach Specialist in the summer of 2011; see Position Description, Defendants' Responses to Document Requests, April 12, 2013, Exhibit 12. Director Henry served on a panel that was responsible for selecting the successful

4

candidate from a list of applicants who were recommended for interviews by another set of people, and Mr. Gardner was not selected for an interview. Henry Affidavit, ¶ 5, Exhibit 8. The panel that narrowed the field by selecting interviewees did not advance Plaintiff because he lacked experience working with native populations, as indicated in the panel comments regarding the applicants not chosen for interviews. *Id*, ¶ 6, and related appended Notes. Prof. Henry never heard anyone express a concern bearing on Mr. Gardner's past disputes with MSU administrators, or regarding his ethnicity or race. *Id*, ¶ 7.

In 2010, MSU adopted a policy mandating a criminal background check before any unit could offer a faculty or academic specialist position to a candidate. Donna Zischke, Director of Academic Human Resources at MSU, manages the system. Zischke Affidavit, ¶¶ 2-3, Exhibit 13. Ms. Zischke, who has been continuously employed at MSU for 42 years, does not know of any instance in which MSU has offered a regular faculty or academic staff position to a person known to have been convicted of a crime against MSU. *Id,* ¶ 4.

### E. Litigation Proceedings

Robert Gardner filed his Complaint on September 21, 2012, and the Clerk issued a Summons on November 14, 2012.[4] He allegedly "applied for and obtained a contingent employment arrangement at MSU under the direction of Gordon Henry, Director of the [NAI] . . .". Complaint, ¶1, p 4 (ECF No. 1). " . . . Dr. Henry agreed to pay/hire Plaintiff when funding became available which they would pursue together." *Id.* "Plaintiff also worked with his Ph.D. supervising professor of record, Dr. James Oehmke. . .". *Id.* No funding became available to Director Henry. In discovery, no contract, email, note, bill, written demand, invoice,

---

[4] In the brief supporting Defendant Simon's pending dispositive motion, she mistakenly stated when this action was commenced. Brief, p. 1 (ECF No. 76). The Complaint was filed on September 21, 2012, and the Clerk issued the Summons on November 14, 2012.

5

W-2 form, or other document arose to support the existence of a contingent or other contractual relationship.

Plaintiff Gardner alleged at ¶ II (1), p. 5 of his Complaint, as follows:

In Summer, 2011, Plaintiff obtained promises of support and funding from the [BIA] contingent [sic] he was able to get support for his program from a Michigan Native American tribe. Plaintiff organized and formalized an agreement between him, the BIA, the Michigan based Pokagon tribe, and his supervising professor, James Oehmke. (Defendant's attorneys had instructed Dr. Henry to not accept the money.)

*Id*, p. 5. Plaintiff did not produce an agreement in discovery. Nor has he specified what money is "the money" that nonparty Henry did not accept under the "formalized " agreement.

Plaintiff alleged as follows:

In October, 2012, Pokagon officials informed plaintiff they no longer wished to allow Pokagon tribal members to have access to tribal lands. Instead, they would only allow local (assumedly MSU affiliated) white farmers this access. This catered to Defendant Simon's continued ambition of stopping Plaintiff's affirmative action programs.

Complaint, p. 6. The layers of incoherence do not allow for meaningful interpretation.

Plaintiff has been denied information "under FOIA" and the Michigan Department Civil Rights and the Equal Employment Opportunity Commission closed investigations of Plaintiff's complaints "uncharacteristically early" and an unidentified "MDCR lawyer with [unspecified] MSU connections was responsible, indicating an MSU conspiracy. *Id*, p. 7.

Plaintiff asserts that Defendant Simon "is preventing Plaintiff's Ph.D. completion". Complaint, pp. 8-10. Plaintiff did not allege supporting fact. He does not claim to have been enrolled at MSU this Millennium. No facts indicate that one may earn a doctoral degree without having matriculated. No contract documents were disclosed in discovery.

The Complaint contains 7 claims against MSU: Retaliation Under Title VII (Count I); "Elliott Larsen Act" (Count II); 42 U.S.C. § 1983 (Count III); Conspiracy Under 42 U.S.C.

§ 1985 (Count IV); Tortious Interference with Contract Rights (Count V); Breach of Contract (Count VII); and, "FOIA" (Count VIII).

### III. ARGUMENT

#### A. Standard of Review

The standard of review governing Rule 56 motions has not changed since this Court stated it in connection with Mr. Gardner's 2011 action. See Opinion and Order, p. 3, Exhibit 2.

#### B. Plaintiff Cannot Sustain His Retaliation Claims

The *prima facie* elements Plaintiff must establish for the statutory federal and state retaliation claims (Counts I and II) of the Complaint are that: (1) he engaged in protected activity under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, and Michigan's Civil Rights Act, M.C.L. § 37.2101, *et seq.*, (2) the exercise of his civil rights was known to the Defendant decision-maker; (3) the defendant took an adverse employment action; and. (4) there was a causal connection between the protected activity and the adverse employment action. *Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000). There is no direct evidence of legal impropriety. Under the burden shifting analysis Defendant MSU must present a reason for its decision-making to meet its initial *McDonald-Douglass* burden of articulating a rational basis.

The record discloses one instance in which Defendant MSU took an action that the law recognizes as adverse to Plaintiff Gardner, Defendant MSU's decision to hire someone other than him in the summer of 2011 for the Outreach Specialist position in the NAI. Mr. Gardner was among the eleven (11) applicants for the position. NAI Director Gordon Henry explained that a subgroup of Committee Members (Whyte, Chau, and Calcatera) selected the candidates to be interviewed. See Affidavit of Gordon Henry and accompanying Report, Exhibit 8. Dr. Henry does not know of anyone expressing knowledge or concern about Mr. Gardner's past complaints

or disputes with MSU administration. *Id*, ¶ 7. Nothing suggests that any subgroup member was aware that Plaintiff had ever raised a civil rights concern. Nor can Plaintiff establish the requisite causal connection. The Committee Reports states that lack of "cultural competence" with respect to tribal communities was a shortcoming in Plaintiff's candidacy. Report, *id*, p. 5.

No facts support Plaintiff's implicit and necessary assertion that he was more qualified for the position than the other candidates. He cannot show that the other candidates devoted years to unproductive graduate study, or that other candidates were banned from the MSU campus as a consequence of having engaged in bad behavior there.

### C. The Retaliation Claims Under Title VII and the Elliott-Larsen Act Fail

An employer may not "discriminate against . . . an applicant for employment . . . because he has opposed any practice made an unlawful employment practice by [Title VII] . . .". 42 U.S.C. § 2000e-3(a). Claims under the Elliott Larsen Act, M.C.L. 37.2101 *et seq.*, are treated under the same analytical rubric. *Humenny v. Genex Corp.*, 390 F3d 901, 906 (6th Cir. 2004).

Plaintiff was an applicant for the Outreach Specialist position in the NAI in 2011. The record suggests that the subgroup of panel members who recommended candidates for interviews knew anything about Plaintiff's civil rights complaints or expressed concern along such lines. Henry Affidavit, ¶¶ 5-7, Exhibit 8. The subgroup did not regard Plaintiff as a competitive candidate. *Id,; see also,* accompanying group notes. Even had the panel at the NAI proposed to hire Mr. Gardner, there is no factual basis that allows the inference that Donna Zischke would have graced her 43rd year on the job with approval for hiring someone who had capped his last campus farewell with an ego driven criminal trespass charge.

8

### D. Defendant MSU Is Not A "Person" Under the Civil Rights Act

Defendant MSU is not a "person" under the Civil Rights Act, 42 U.S.C. § 1983 and § 1985, as this Court explained at pp. 8-10 of its Opinion and Order issued on February 2, 2012, in the precedent suit against these defendants. See Exhibit 1 to Defendant MSU's Motion, and Counts III and IV ought to be disposed on that basis.

### E. Plaintiff Cannot Sustain A Claim Of Tortious Interference With Contract

The whole of the substance of Court V of the Complaint provides:

> As described, Defendant interfered with numerous parties to breach contracts, disrupting the ability of Plaintiff to perform his obligations under the contracts, thereby preventing the Plaintiff from receiving the performance promised.

Complaint, ¶ 2, p. 17 (ECF No. 1). In discovery, Defendants sought contracts and while a great deal of paper was transmitted, there were no contract documents. Defendant MSU knows that this Court is sensitive to the pleading largesse afforded *pro se* complainants. The difficulty here is not a matter of technicality of any sort. While Plaintiff avers, for instance, having described how MSU "interfered with numerous parties to breach contracts", the averment is blather. No interference with any identifiably contractual relationship has been alleged or revealed. Mr. Gardner apparently made a bad impression on the Pokagon Band at or following the campus luncheon gathering, and talk about prospective projects involving Mr. Gardner did not come to fruition. A fundamental element of a "tortious interference" claim is an intentional interference by the defendant inducing or causing a breach or termination of the relationship or expectancy. *Clinical Laboratories v. Blue Cross & Blue Shield of Mich. (On Remand)*, 217 Mich. App. 687, 698-699; 552 N.W.2d 919 (1996). The record does not show that Defendant MSU intentionally engaged in any improper or unjustified act.

9

Defendant MSU further submits that Plaintiff has not pleaded in avoidance or otherwise avoided the statutory grant of immunity under the Government Tort Liability Act, M.C.L. 600.1410 *et seq*. There is no generalized "good faith" precondition to be satisfied in for MSU to access the protections afforded governmental entities under state law. The GTLA does not superimpose separate conditions or standards respecting tort theories other than negligence.

### F. No Contract Was Breached

Plaintiff alludes broadly to "his employment" and "his Ph.D. Committee" in the context his breach of contract claim, Count VII. Mutuality of understanding is essential to contractual relations. See, generally, *Romska v. Opper*, 234 Mich. App. 512; 594 N.W.2d 853 (1999). Mr. Gardner's hopes and expectations, however dearly held, were not contractual.

### G. State FOIA Claims Are Best Left To State Courts

Plaintiff alleged that "On August 15, 2012, Plaintiff requested related educational and employment documents under the Freedom of Information Act (FOIA)." and that MSU stated a charge of $4,000. Plaintiff's desire for access to education records of 2009 graduate study applicants became a focal point in discovery proceedings in this litigation, but the subject FOIA claim did not receive proper attention. Defendant MSU urges the Court to not entertain supplemental jurisdiction over the claim.

### H. The Untimely 2009 Graduate Study Admissions Claim Fails On The Merits

Although Plaintiff offered no allegation related to his 2009 application for admission to MSU's graduate school, Plaintiff attached singular import to an off-handed comment from the bench during a hearing on a discovery dispute that was taken as suggesting that his academic record was relevant to his claims. In any event, in his June 14, 2013 Response to Defendants' Second Set of Requests for the Production of Documents, Plaintiff concedes that he had not

10

submitted an application for graduate study since November 1, 2009. See Response, item # 1, and discovery request, Exhibit 14. Plaintiff was last denied admission on March 25, 2009, Letter, Exhibit 7, more than three years before this action was commenced in September, 2012.

The governing limitations period provided by state law for injury claims is three years from the time the claim accrues, that is, the time when the asserted injury or wrong took place. Revised Judicature Act, M.C.L. 600.5805(10); see also, *Magee v. Daimler-Chrysler Corp., 472 Mich. 108; 693 N.W2d 166 (2005).* The three-year period also applies with respect to claims asserted under the Michigan Civil Rights Act, M.C.L. 37.2101, *et seq., Garg v Macomb County Community Mental Health,* 472 Mich. 263, 266; 696 N.W. 2d 646 (2005). Federal civil rights claims are subject to the same limitation period as applies with respect to personal injury claims in the given state. See *Wilson v. Garcia,* 471 U.S. 261, 276; 105 S.Ct. 1938, ___ L.Ed.2d ___ (1985); *Carroll v. Wilkerson,* 782 F.2d 44, 45 (6th Cir. 1986). For federal statutory claims made possible by Congressional enactments after 1990, the old borrowing rule does not apply; rather, a four year limitations period is apt, per 28 U.S.C. §1658. Defendants understand plaintiff's federal claims to be premised on federal law that was extant as of 1990. Plaintiff's claims that accrued before September 21, 2009, must be dismissed as they are outside the limitations period. Further, any such claim could have been brought, and was required to have been brought, in connection with Mr. Gardner's 2011 lawsuit against MSU. The putative claim is merged in the judgment rendered in that case, and reassertion is precluded by the *res judicata* doctrine.

On the merits, the Associate Chair of Agriculture, Food and Economic Resources, Steven Hanson's office provided the file Plaintiff requested regarding the 2009 denial of his application. Prof. Hanson's negative recommendation is due to Plaintiff's poor academic record. See Memo

11

and related material, Defendants' Second Supplemental Response to Document Request, Bates pp. 41-46, July 13, 2013, Exhibit 15.

### IV. RELIEF REQUESTED

Defendant MSU seeks dismissal or summary judgment of the claims advanced in the Complaint, for the reasons stated, with prejudice and with such costs as are allowed by rule.

Respectfully submitted,

Dated: October 14, 2013

Michael J. Kiley
Attorney for Defendants