UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN, SOUTHERN DIVISION


ROBERT GARDNER,                          Case No. 1:12-cv-1018

           Plaintiff,                    Grand Rapids, Michigan
                                         September 19, 2013
-v-                                      9:57 a.m.

LOU ANNA SIMON AND THE
MICHIGAN STATE UNIVERSITY                HON. PAUL L. MALONEY
BOARD OF TRUSTEES,

           Defendants.
_____/



                    MOTION HEARING
        BEFORE THE HONORABLE JOSEPH G. SCOVILLE
            UNITED STATES MAGISTRATE JUDGE



APPEARANCES:

In Pro Per:              Mr. Robert Gardner
                         1625 Grovenburg Rd.
                         Holt, MI  48842
                         (517) 694-1760


For the Defendant:       Mr. Michael J. Kiley
                         Michigan State University
                         Office of the General Counsel
                         494 Administration Building
                         East Lansing, MI  48824-1046
                         (517) 353-3530


For Movant BIA:          Mr. Michael Shiparski
                         U.S. Attorney
                         The Law Building
                         330 Ionia Ave., NW
                         Grand Rapids, MI  49501-0208
                         (616) 456-2404

1        Grand Rapids, Michigan

2        Thursday, September 19, 2013 - 9:57 a.m.

3        THE COURT:  Case number 1:12-cv-1018, Robert Gardner

4   versus Michigan State University Board of Trustees, et al.

5        This is the time set for a hearing on several

6   discovery motions filed by plaintiff, as well as a motion for

7   relief from a previous order of the Court filed by the Bureau of

8   Indian Affairs, and a motion to extend the time for discovery and

9   inferentially all the dates and deadlines in the case.

10       Appearing on behalf of plaintiff, he appears in pro

11  per, Mr. Gardner.

12       On behalf of all defendants, Attorney Michael Kiley.

13  And on behalf of the BIA, Mr. Shiparski.

14       Mr. Shiparski, I'd like to take up your matter first

15  since you're not a party to all this other stuff.  I've got a

16  number of questions about the position that you've taken on

17  behalf of the BIA.

18       First of all, what makes you think that Rule 60(b)

19  has anything to do with this?

20       MR. SHIPARSKI:  Your Honor, we came in a little late

21  in the ball game and I thought it was necessary to seek relief

22  from your order to respond to that subpoena, in effect, an order

23  to show cause, and that's the reason I thought that Rule 60(b)

24  would provide us some relief from that order to try to set this

25  matter on the right track.

1        THE COURT:  Well, I think you took on a burden that

2   you didn't need to.  This is not a file on an appealable order.

3   Rule 60(b) only deals with judgments, and lawyers like to -- some

4   courts like to throw Rule 60(b) around, but the fact is that as

5   long as an order is not final and appealable it's subject to

6   revision at any time so I'm not going to pay any attention to

7   Rule 60(b).

8        But I've got some questions about your position here.

9   The first has to do with what the BIA did in response to the

10  proceedings in this court.

11       Apparently when they got the subpoena, when BIA got

12  the subpoena, Mr. Blake sent a letter with a copy to this court

13  dated April 8th invoking Twohey, right?

14       MR. SHIPARSKI:  Correct, your Honor.

15       THE COURT:  Okay.  Then we had a hearing -- no, then

16  there was a motion filed by the plaintiff and I issued an order

17  saying that the plaintiff had to serve his motion to compel

18  compliance on the non-parties who were subpoenaed, Victor

19  Christianson and Troy Clay, and it's Christianson who relates to

20  this case, right?

21       MR. SHIPARSKI:  Yes, your Honor.

22       THE COURT:  So was that done?

23       MR. SHIPARSKI:  As I see from the record, your Honor,

24  there was notice and proof of service to Victor Christianson and

25  to a Robert Hall who is also an attorney at the Office of

1  Solicitor for the Department of Interior.

2            Where there was a disconnect was the response to the
3  subpoena that your Honor first mentioned from Mr. Blake tried to
4  maybe not artfully enough get the matter on the right track by
5  informing Mr. Gardner that the correct individual now to contact
6  would be not Mr. Christianson but a Mr. Stevens, and gave him the
7  address.

8            And unfortunately there's a disconnect because Mr.
9  Gardner kept reaching out to Mr. Hall and Mr. Christianson and to
10 some extent an Ann Jennings.  Christianson and Jennings both
11 being at the Bureau of Indian Affairs.

12           And as those matters were sent their way it was not
13 apologizing for the Bureau of Indian Affairs and Office of the
14 Solicitor on the wrong radar screen so Mr. Blake didn't pick that
15 up.  And the next thing that happens is, yes, it was sent there
16 but it wasn't responded because it was off in the wrong
17 direction.

18           And it is unfortunately after the Court issues the
19 order that it finally gets on the right track and winds up in our
20 office here in Grand Rapids to try to address -- first trying to
21 address Mr. Gardner's concern and, second, filing the motion for
22 relief and to quash the subpoena, all with the intent to try to
23 get this on the right track of a Twohey request.

24           THE COURT:  I understand that but, you know, Mr.
25 Blake wasn't really acting in a very lawyer-like fashion when he

1   just sends a letter to the Court.

2          If he'd filed an appearance his name would have

3   gotten on the docket sheet and he would have gotten notice of

4   this.  But to just dump a letter in the record requires the Court

5   to, you know, to read the letter and to figure out what Mr. Blake

6   is up to and, frankly, that didn't happen because it wasn't clear

7   that anybody was appearing on behalf of BIA.

8          This is the sort of thing pro se litigants do.  They

9   send letters to the Court and hope something happens.  So if the

10  BIA didn't have proper notice of this it wasn't the Court's fault

11  and it wasn't Mr. Gardner's fault.  Okay.

12         So there was actual notice although a bureaucratic

13  snafu.

14         Now, Twohey, at it relates to federal court

15  subpoenas.  Isn't there a quite substantial body of law coming

16  out of the DC circuit and then filtering down through the trial

17  courts saying that there is no sovereign immunity against federal

18  subpoenas; that there is sovereign immunity with regard to state

19  court subpoenas but not federal subpoenas so that we have a whole

20  different analysis when it comes to federal subpoenas.

21         MR. SHIPARSKI:  I don't disagree, your Honor, but I

22  would rely on the fact that the regulations were in place and I

23  think Twohey and the housekeeping I guess line of cases and

24  regulations that follow that were set up to try to give the

25  government an orderly way to respond to these kind of things with

1  efficiency and resources and all that under consideration.

2  THE COURT: You're really not addressing my point and

3  that is that there are a number of courts that disagree with what

4  you just said when it comes to federal subpoenas.

5  MR. SHIPARSKI: I still think it's for a non-party,

6  your Honor. I mean, when the BIA, a non-party in the action, is

7  subpoenaed as a non-party, third-party, no interest in the law

8  suit, I think Twohey would still apply.

9  THE COURT: Isn't that always the case when there's a

10 subpoena issued?

11 MR. SHIPARSKI: Yes, your Honor.

12 THE COURT: And have you thought about In Re Banker's

13 Trust, which is now almost 20 years old, where the Sixth Circuit

14 said that Twohey regulations issued under the housekeeping

15 statute go beyond the scope of their authority when they try to

16 override the Federal Rules of Civil Procedure and divest a Court

17 of jurisdiction over discovery. Are you aware of --

18 MR. SHIPARSKI: I apologize, no, your Honor.

19 THE COURT: Well, your brief cites all of the cases

20 that support you but there are a whole bunch of cases where --

21 especially the lower federal courts and the eastern district --

22 are getting sort of sick of this hiding behind Twohey to get

23 around federal subpoenas.

24 Judge Borman ruled about 18 months ago that when it's

25 a federal subpoena there's no sovereign immunity and that

basically <u>Twohey</u> doesn't apply, and that the rules of privilege

and all that can be vindicated in response to a subpoena in an

orderly fashion and that the housekeeping regulations of these

various agencies just are not going to impede federal discovery.

Are you aware of those cases?

          MR. SHIPARSKI:  No, your Honor, I'm not.  This is,

frankly, my exposure to <u>Twohey</u> has always been in the state court

and --

          THE COURT:  Right.

          MR. SHIPARSKI:  -- and as far as federal court

subpoenas go maybe somewhere along the line that that was an

issue that I had dealt with but it was dealt with across the

table earlier than the circumstances that I was met with here.

          Frankly, looking for case law to help me out from

underneath the Court's order and given the circumstances, that's

what generated and drove the brief I filed and the position I

took after attempting to some extent to set the matter straight

and to get the proper request before the BIA so they could look

if they had anything responsive to the subpoena.

          THE COURT:  Well, let's talk about that.  Do you we

know whether they have anything responsive?

          MR. SHIPARSKI:  I don't know, your Honor.  I know

that there was a FOIA request to the BIA in November of 2011 or

to Washington; that Mr. Gardner received a response that they had

nothing responsive to his inquiry focusing on Ann Jennings at the

BIA and policies and procedures I think with respect to how

programs that the BIA may have given funding for were run.

Then another FOIA request was sent to the Michigan

agency of the BIA in August of 2012 where I understand Mr.

Gardner received some documents responsive to this September 2011

award from the BIA to the Pokagon Band for I think the research

project that is swirling around in the case-in-chief.

THE COURT:  Mm-hmm.

MR. SHIPARSKI:  I have them looking for materials

that relate to that at the BIA in Washington, DC, and they have,

I know, been reaching out to the Michigan agency of the BIA with

respect to the subpoena drawing from the subpoena that underlies

this matter that I have before the Court right now.

So, I don't know, they've been responsive in a

certain respect to this FOIA request that some documents were

turned over.  I don't know if there are additional ones.

The program manager, I learned the end of last week,

the program manager that was associated with this September 2011

award is now retired so that was an issue that they were dealing

with to try to regenerate where and how to look for materials

responsive to that award.

THE COURT:  Okay.  Well, I'm going to write a little

opinion on this because I'm sure the government won't take this

sitting down.

But as far as I can tell -- and the Sixth Circuit has

1  not ruled on this -- but as far as I can tell the sort of weight

2  of modern authority is, number one, there's no sovereign immunity

3  issue.  The federal government has waived sovereign immunity in

4  federal court so there's no immunity from a federal subpoena.

5         And as you indicate a lot of this law came up from

6  state courts, but federal court is different.

7         And, second, I'll just cite for today's purposes a

8  recent case from Judge Borman, <u>In Re Packaged Ice Anti-Trust</u>

9  <u>Litigation</u>, 2011 Westlaw 1790189, May 10th, 2011, so it's a

10  couple years old now, in which he analyzes better than I could

11  the whole issue, and says that the weight of modern authority

12  from this century in the federal circuits is that a challenge to

13  an agency's refusal to comply with a Rule 45 subpoena should

14  proceed and be treated not as an APA action but as a Rule 45

15  motion to compel, and that the standards set up by the Rules of

16  Civil Procedure are what apply to a summons and not <u>Twohey</u> when

17  it comes to federal court.

18         And Judge Borman relied on the <u>In Re Banker's Trust</u>

19  <u>Company</u> case, 1995 decision of Court of Appeals, 621 Federal 3rd

20  465, which is not directly on point, but there the Court of

21  Appeals had occasion to discuss this whole issue of <u>Twohey</u>

22  regulations issued under the housekeeping statute, and the Court

23  of Appeals squarely held that the <u>Twohey</u> regulations step beyond

24  the statutory delegation when they purport to override the

25  Federal Rules of Civil Procedure or divest the federal courts of

1  jurisdiction over discovery.

2          So Twohey isn't going to do it in this case.  I'm

3  going to, as I said, I'm going to issue a short opinion making

4  that clear in case anybody wants to continue this debate before

5  higher authorities.

6          So I'm going to enter a final order enforcing the

7  subpoena, not holding anybody in contempt.  Obviously there are

8  serious issues here.  But it seems to me that the agency has been

9  on notice for a long time that Mr. Gardner wanted these records

10 and they essentially ignored the subpoena and they ignored the

11 hearing that was set by the Court.

12         I tried to make it clear to Mr. Gardner that he had

13 to notify the BIA about this and he did, he followed the Court's

14 order.  Apparently the BIA fumbled the ball on their end.  Mr.

15 Blake could have avoided that by filing an appearance and an

16 objection to the subpoena rather than a letter.

17         So the subpoena was properly served.  The motion was

18 filed and properly notice and served on the deponent.  The person

19 was subpoenaed.  It was ignored.  Rule 60(b) doesn't apply.  I'm

20 looking at this thing de novo but in the context of a party that

21 has ignored a motion to compel, and the only objection raised is

22 the regulation, the Twohey regulation and I find it doesn't

23 apply.

24         And so I'll give the subpoenaed party 14 days to

25 comply and to produce the responsive records.  There's only one

1  or two categories as I recall.

2          But these agencies ought to start paying attention to

3  some modern authority that indicates that when you're in federal

4  court it's a completely different analysis from state court.

5  Okay.

6          MR. SHIPARSKI:  Yes, your Honor.  Thank you.

7          THE COURT:  Thank you.  So that motion is granted.

8  An order enforcing the subpoena giving 14 days to comply will be

9  entered.

10          MR. SHIPARSKI:  Thank you.

11          THE COURT:  Okay.  Thank you.

12          Now, Mr. Gardner, I don't think it's an exaggeration

13  to say that you have abused the Court with your multiple filings

14  here.

15          You filed an original motion to compel having to do

16  with some document request that you served, and then Mr. Kiley

17  responded, and you filed a supplemental motion to compel which as

18  far as I can tell has to do with the same subject matter.  Am I

19  right about that, the same requests?  You just wanted to weigh in

20  again with more arguments.

21          THE PLAINTIFF:  I wanted to make the point that he

22  responded but the response is not complete.

23          THE COURT:  Yeah.

24          THE PLAINTIFF:  I didn't know how to address that.

25          THE COURT:  Okay.  So, number one, you filed a reply

1  brief without -- reply briefs under our rules, if you're going to

2  litigate in our court you have to read the rules.  There are no

3  reply briefs allowed without leave of court.

4         Instead of filing a reply brief you file this

5  supplemental motion and re-argue the whole thing again and force

6  Mr. Kiley to file another response on the same basic issue and

7  that is you want your PhD files and they say there aren't any,

8  and that is an appropriate answer.  If they say there aren't any

9  then that's it.  I can't make a party produce documents out of

10  thin air.

11         Now, they did produce several interesting documents

12  including a memo from some professor or another who very

13  interestingly detailed your history at MSU from 1990 to 1998 when

14  you were in the PhD program, and it says they spent $120,000 on

15  all of your projects in support of that, and then you withdrew in

16  1998 or they cut you off or whatever happened in 1998.  It's

17  really not germane.

18         And then you applied again and this professor -- Mr.

19  Kiley, can you help me with which one of your exhibits this is?

20  You know what I'm talking about?

21         MR. KILEY:  I'm not certain.  What motion are we

22  talking about, your Honor?

23         THE COURT:  Yeah, that's a good question -- since you

24  have filed duplicative motions that really argue the same thing

25  over and over and over again.

1          Well, first of all, the point I'm making -- and I got

2    a little side-tracked -- the point I'm making is that the

3    defendants' responses have attached documents responsive to your

4    requests.  Apparently in 2009 you did, in fact, apply.  We have

5    reviewed -- March 25, 2009, "We've reviewed your application for

6    admission to Department of Agricultural Economics.  I regret to

7    inform you we cannot recommend approval."

8          So they gave you the documents that you asked for.

9    You asked for documents having to do with your recent PhD

10   efforts.  Mr. Kiley went back to 2009 and found some documents

11   indicating that you did, in fact, apply, and that they said no,

12   and there are other documents.  There's your application and

13   there's some other stuff here.

14          THE PLAINTIFF:  I also asked for documents that other

15   people applied for comparative and I didn't get those and that

16   was --

17          THE COURT:  What does that have to do with this case?

18          THE PLAINTIFF:  I need to show a pattern of

19   discrimination and that I was more qualified and that I have to

20   show that that decision was not the department's decision and

21   that it was based on discrimination and that there's a pattern.

22          THE COURT:  What's that have to do with this case?

23          THE PLAINTIFF:  A proof of discrimination is a

24   history of discrimination and I want to be able to prove that

25   this current discrimination evolved -- is a part of the history.

1           THE COURT:  So you want everybody else who applied --

2           THE PLAINTIFF:  Which is not very many.

3           THE COURT:  -- in support of which of your theories

4   in this case?

5           THE PLAINTIFF:  That I'm being retaliated and

6   prevented from completing my PhD.

7           THE COURT:  Retaliation has nothing to do with

8   comparables.  Retaliation has to do with --

9           THE PLAINTIFF:  Timing.

10          THE COURT:  -- number one, did you make a protected

11  statement.  And, number two, did they take an adverse action.

12  Number three, is there the requisite causal connection between

13  the adverse action and the protected statement.  That has nothing

14  to do with anybody else.

15          As far as I can tell you have a retaliation under

16  Title VII claim here but there is no claim that you were treated

17  in a disparate way on account of race, religion, gender, any of

18  those other things.

19          So comparables are not within the scope of relevancy

20  or discovery in this case.

21          THE PLAINTIFF:  And that's what I was asking for with

22  my supplemental.  I didn't know how to do it appropriately.

23          THE COURT:  Say that again?

24          THE PLAINTIFF:  That's what I was hoping to get was

25  the comparables with that.  He had given me everything but the

1   comparables and I didn't know how to address the fact that he

2   hadn't provided the comparables.

3                THE COURT:  You don't get comparables because --

4                THE PLAINTIFF:  Right, but, I mean, that's what I was

5   asking.

6                THE COURT:  -- it's irrelevant.

7                THE PLAINTIFF:  Okay.

8                THE COURT:  So this whole big motion to compel and

9   supplemental motion to compel, Dockets 82 and 93, all had to do

10  with that and there's just no cause in this case to get into

11  disparate treatment or comparables because this is a retaliation

12  case.

13               THE PLAINTIFF:  Okay.

14               THE COURT:  Then you've got with regard to defendants

15  the second motion to compel, Docket No. 103, and again all I can

16  tell is that you asked them for something and you're dissatisfied

17  with their answer.

18               THE PLAINTIFF:  Yes.

19               THE COURT:  But you didn't attach their answer so

20  it's a little hard for me by your papers to see exactly what you

21  asked for and what they -- I know what you asked for but you

22  didn't tell me what they gave you and what they didn't give you.

23               And again apparently they did give you something in

24  response to your third request.

25               THE PLAINTIFF:  Pokagon had -- there was some

financial interactions between the Pokagon Band and Michigan

State University that I allege as proof that money had been taken

from me that was promised to me and reallocated to MSU.

They referred to it in Exhibit 3 that the money

existed but I was trying to find the amount and all that to

substantiate that particular claim, and that's the basis of this

particular motion.

THE COURT: I agree with defense counsel that your

requests are convoluted to say the least.

But, Mr. Kiley, turning to you, what have you

produced concerning this grant from the tribe or to the tribe?

MR. KILEY: I conferred with three people, two of

whom Mr. Gardner had identified who I thought may know something,

and asked them to provide me everything relating in any way to

any interaction, any documentation, anything, and produced seven

sets of material including 17 pages of e-mails, a plan of work.

I produced everything that I could find that referred

to MSU and the Pokagon Band.

THE PLAINTIFF: Your Honor, there's an e-mail right

here that indicates that there was a money transfer occurring and

I did not receive any documents about that money transfer, and I

know Michigan State as an entity like that keeps very good track

of how money flows through their institution.

THE COURT: You want an audit where the money went?

THE PLAINTIFF: I want to know where the, yeah, who

1   get -- the Pokagon's gave the money to Michigan State University.

2   I'd like to know how much and where.

3           THE COURT:  What are you holding up there for my

4   edification?

5           THE PLAINTIFF:  It's Exhibit 3.  May I present it?

6   Exhibit 3 to this particular one.

7           It's an e-mail from Henry Gordon, the Director of

8   North American Institute of MSU, to some people from Pokagon Band

9   and copied to a couple of the employees at MSU that took over the

10  project, and it says, "Thanks for the update.  The Native

11  American Institute has sent invoices to the Pokagon.  You can

12  bill the Native American Institute for the project."

13          Money's being transferred between the Pokagon and MSU

14  and I'd like to be able to show that that was money that that was

15  promised to me.

16          THE COURT:  And what do you think -- how do you think

17  the invoices are going to show that?

18          THE PLAINTIFF:  The paper trail.  They're going to

19  have -- MSU will have a specific number assigned to a specific

20  project and once I assign the project the Pokagons -- I have a

21  subpoena to them -- I'm asking them for what happened to the

22  money that the BIA gave them, the Bureau of Indian Affairs, and

23  I'm trying to show that that money from the Bureau of Indian

24  Affairs that was delegated to me went to Michigan State

25  University in order to enhance my tortious interference claim,

1  retaliation claim.

2           THE COURT:  They're not disputing that the money went

3  to them.  It's your job to prove that it was promised to you.

4           THE PLAINTIFF:  Right.

5           THE COURT:  Are they saying, yeah, we paid Gardner?

6           THE PLAINTIFF:  Is this the money that was promised

7  to me?  That's what this paper trail will show.

8           THE COURT:  How in the world will it show that?

9           THE PLAINTIFF:  Because it has invoices with account

10  numbers.  It'll show what the Pokagons were being billed for if

11  it was due my particular project, and from there I can go to the

12  Pokagons and say, hey, where did that money come from, and if it

13  came from the Bureau of Indian Affairs I can say, ah-ha, your

14  Honor, that was money promised to me that MSU took from me.

15           THE COURT:  How was the money promised to you?

16           THE PLAINTIFF:  I had a contract.  We had a contract

17  with the Pokagons and the Bureau of Indian Affairs.  I worked

18  with them to get the money to line up a tribe, and they gave the

19  money to the tribe to hire me and Jim Oehmke, my major professor,

20  and to conduct research for them, and then all of a sudden out of

21  the blue Pokagon said they were going to work with someone else

22  at Michigan State University.

23           We have a grant, a signed grant.  We have promises

24  from the Pokagon Tribe to the Bureau of Indian Affairs that this

25  was a project that they would endorse and support heartily and

1  that's what I've got to show you, your Honor.  That's what I have

2  to get that information to prove that to you, your Honor.

3            THE COURT:  No, you don't.

4            THE PLAINTIFF:  All right.

5            THE COURT:  The information that you're seeking is in

6  pursuit of an undisputed fact.

7            Mr. Kiley, does anybody in this case claim that Mr.

8  Gardner got any of this money?

9            MR. KILEY:  No.

10           THE COURT:  The question is whether he was entitled

11 to any of it.

12           MR. KILEY:  Correct, your Honor.

13           THE COURT:  All right.

14           So it's undisputed that you got none of this.

15           THE PLAINTIFF:  Did MSU get this money from the

16 Pokagon's?  Is this my money that the Pokagon's gave you?  That's

17 the question I'm trying to find.

18           THE COURT:  Did they get the money?  Is this my

19 money?  Those are two very different --

20           THE PLAINTIFF:  All right, well, it's --

21           THE COURT:  Two very different things.

22           THE PLAINTIFF:  But do you see what I'm driving at,

23 your Honor?

24           THE COURT:  No, I don't.  No, I don't, not at all.

25           I see what you're contending but what I don't see is

how this particular discovery moves the ball. That's really the
question under Rule 26. Does it tend to make the disputed issue
more or less likely? And the fact that there was money going
back and forth from these people is undisputed. The question is
did you -- was that your money, as you put it.

THE PLAINTIFF: Yes. Okay.

THE COURT: This doesn't tend to show that that's
your money; it just tends to show that there was money going back
and forth.

THE PLAINTIFF: Well, MSU does have that information
about where the -- when they got -- they billed Pokagons they had
that information. That's the documents I'm not getting.

THE COURT: The fact that they have it doesn't mean
that it's discoverable in this case.

THE PLAINTIFF: Okay. And that's what I'm trying to
argue to your Honor is can I get that information to show you
that that money was the money that was earmarked for the project
that me and Dr. Oehmke were working on.

THE COURT: It doesn't --

THE PLAINTIFF: Okay.

THE COURT: It doesn't tend to show that. And that
leads me to two other things and that is, first of all, this
subpoena to the Pokagon Tribe.

Mr. Gardner, you did not give me the last
communication from their counsel to you, and Mr. Kiley had to

1  give that to me.

2          THE PLAINTIFF:  That's because it occurred after I

3  had filed and I have that.

4          THE COURT:  Oh, well, you certainly know how to file

5  things afterwards when you want to, now, don't you?  You

6  certainly know how to file serial documents in support of the

7  same issue when you want to.

8          THE PLAINTIFF:  Was I supposed to send that letter to

9  you then?  I didn't know.  I mean, there was no motion to be

10  accompanied with it.

11          THE COURT:  Isn't it quite misleading for you to say

12  that, as you did, they didn't respond, they said nothing, I never

13  heard from them, they ignored your order.  That's what you said.

14          THE PLAINTIFF:  And when I filed this they had not

15  responded; they had ignored my order.  I got this e-mail that

16  night at 5:30 -- and I actually pulled it and I was going to give

17  it to you -- at 5:30 and it was after this particular subpoena,

18  this paperwork was filed to you.

19          I filed the paper, came home, and then that night

20  about seven or eight, whenever I checked my e-mail, I saw that

21  they had issued me a response.

22          THE COURT:  Making what you said misleading.

23          THE PLAINTIFF:  Unintentionally misleading.

24          THE COURT:  Okay.

25          THE PLAINTIFF:  As of that day it was not misleading.

1  They had not responded at all.  So I filed the motion and that
2  night maybe they saw it through PACER or something that I filed
3  that and they sent me an e-mail.

4          THE COURT:  And you didn't think it necessary to
5  bring that to the Court's attention?

6          THE PLAINTIFF:  No, I didn't.  I thought there was
7  another -- it didn't say anything and they never gave me any
8  documents.  If they give me documents, yes, then I have to.  If
9  they don't give me documents, I got promises all the time.

10          THE COURT:  Well --

11          THE PLAINTIFF:  I don't know how to file a
12  supplemental motion with this.  I don't know how to --

13          THE COURT:  You do know how to file a supplemental --

14          THE PLAINTIFF:  I do.

15          THE COURT:  -- motion, sir, you do it all the time.

16          THE PLAINTIFF:  Right.

17          THE COURT:  On the basis of the e-mail which says
18  they've given you everything that they have responsive the motion
19  is denied, and also because you can play games with Michigan
20  State but you can't play games with courts of law, and that's
21  what you've done on this.  You fail to bring all the facts to the
22  Court's attention, and that's sanctionable.

23          Now, you have filed three merit-less motions -- four
24  -- and you bring Mr. Kiley in here constantly to put up with this
25  stuff.

1          I am sanctioning you in the amount of $150, which is

2   a pittance, to reimburse Michigan State for some of the

3   unnecessary time that they have put in responding to

4   undecipherable discovery requests and then seriatim motions that

5   really argue the same thing over and over again.

6          You have to understand this is not a game and you're

7   treating it like a game.  And truth is not something -- truth is

8   what it is.  So when the tribe responded to you and you had filed

9   documents saying that they didn't in good faith you had an

10  obligation to inform the Court of that and you let the thing go

11  for weeks and weeks.  It was up to Mr. Kiley then, who just

12  happened to know, to bring this to the Court's attention, which

13  is really reprehensible.

14         I am not extending this tortured case by even one

15  day.  There is no good cause to extend the discovery period.

16  Everybody's suffered enough with this case.  And after reading

17  that very long response, very detailed response of some professor

18  as to why they were unwilling to let you back into the program,

19  that sheds a lot of light on everything you're saying here, but

20  that's for another time.

21         But it really was quite enlightening to me as to --

22  you've been telling a one-sided history of your relationship with

23  Michigan State in this case.  They apparently gave you nine years

24  to finish your PhD and spent a lot of money on your projects and

25  ever since then you've been suing them as far as I can tell.

1          All right.  So I'm going to -- in summary I'm going

2    to deny all motions except the motion to enforce the subpoena on

3    Christianson.  A final order will be entered on that, not a

4    contempt citation, and I'll support that with a little memorandum

5    as well.

6          All right.  Thank you, gentlemen.  Court's adjourned.

7          MR. KILEY:  Thank you, your Honor.

8          MR. SHIPARSKI:  Thank you, your Honor.

9          (At 10:35 a.m., proceedings adjourned)

10                         _ _ _ _ _

CERTIFICATE


I, Patricia R. Pritchard, CER 3752, Certified Electronic Court Reporter for the State of Michigan, do hereby certify that the foregoing pages, 1 through 25, inclusive, comprise a full, true and correct transcript, to the best of my ability, of the proceedings and testimony recorded in the above-entitled cause.


October 25, 2013          Patricia R. Pritchard  /S/
                          Patricia R. Pritchard, CER 3752