


**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF MICHIGAN**

**ROBERT GARDNER,**
**1625 Grovenburg Rd**
**Holt, MI 48842**
**(517) 694-1760**

**Plaintiff,**

**Honorable Judge Maloney**

**Case No. 1:12-cv-01018-PLM**

**v.**

**Michigan State University Board of Trustees**
**and Lou Anna Simon, Jointly**
**Defendant,**

**Michael Kiley, Attorney for Defendant**
**Office of the President**
**Michigan State University**

---

# Brief in Support of Plaintiff's Opposition to Defendant's Motion for Summary Judgment

## I. Introduction.

Defendant's memorandum in support of this Motion for Summary Judgment is a glib blend of omission or misstatement of critical fact and a misleading recitation of the law. It relies heavily on ad hominem attacks of plaintiff which helps establish an underlying retaliatory motive.

## II. Statement of Facts

A. Background – A well-documented history of retaliatory behavior as relevant to Defendant's allegations.

1. **1994**. Plaintiff files a Civil Rights complaint against MSU related to his Migrant Farm Worker Program that he hoped to use for his Doctoral Research. (Exhibit 1) He had past racial issues with some past professors from MSU's Animal Science Department, one of which was an MSU administrator friend of Defendant Simon. (Exhibit 2)
   a. From that point on his Ph.D. funding was taken away (Exhibit 3).(One year exception due to ACLU intervention explained later).
   b. Other white students received full financial aid. (Exhibit 4)
   c. University lawyers monitored all interactions with plaintiff.(Exhibit 5). They refused to address the Animal Science harassment problem when directed by the ADJB Grievance Board Director (Exhibit 6 and 7).
   d. There was administrative pressure to terminate Plaintiff's Ph.D. which the Department initially resisted. (Exhibit 8)
   e. It was found that Plaintiff's Preliminary Examinations were being mis-graded. Plaintiff's supervising professor, Dr. Oehmke, brought this to the Departments attention. (Exhibit 9)
2. **1996**. A threatening letter from the ACLU (Exhibit 10) enabled Plaintiff to get one year departmental funding in 1997 (Shown in Exhibit 3)

3. 1996 The University General Counsel would do not provide a written plan to get Plaintiff's Ph.D. nor allow his financial aid to be reinstated beyond the 1997. They acknowledged the situation would not be resolved. (Exhibit 11).

4. **1997.** Plaintiff filed a Civil Rights lawsuit in Circuit Court against MSU related to his Migrant Farm Worker program and Ph.D. (Exhibit 12)
   a) MSU police immediately visit his office threatening him with arrest, claiming he is intimidating people in the Central Administration (Exhibit 13).
   b) . This rationale is shown to be pretextual by one of the" complainants". She accuses a superior of being the source of the police visits. (Exhibit 14)
   c) The lawyer, Martin Scott, misses many deadlines and is later permanenetly suspended. (Exhibit 15).

5. **1998.** Plaintiff's tell his supervising professor, James Oehmke, that his research data for a dairy dissertation has been destroyed and complains that his committee is being harassed into not helping him. Oehmke files a complaint of harassment (Exhibit 16).

6. **May 1998,** Plaintiff notifies MSU lawyers and College Dean Brandenburg as well of the issue. (Exhibit 17).

7. **June, 1998.** Crawford Brandenburg and Plaintiff meet about the complaint. Crawford insists that Plaintiff finish a Dairy Dissertation, knowing the Data is no longer available. (Exhibit 18)

8. **June, 1998,** Carol Graysmith, Departmental Computer technician, verifies Plaintiff's dairy research data is destroyed and contacts Eric Crawford to inform him of such. (Exhibit 19)

9. **1999**. Plaintiff seeks a restraining order against Defendant Simon from the Student Lawyer, Brian Jeffries, who refuses. Plaintiff complains to the student government president Mike Webb. The Student Government looks into this and takes away much of Mr. Jeffries' budget.

10. **1999,** Defendant Simon is ordered by the MSU Trustees to institute Plaintiff's migrant farm worker program (Exhibit 20). She admits she knew she was facing a related Civil Rights complaint.

a. Plaintiff's Ph.D. program is administratively terminated.

    i. It is based on an eight year rule that "all remaining requirements (of a Ph.D.) must be completed in eight years. (Exhibit 21)

    j. This is misquoted from policy that adds that if the degree requirements are not completed within this eight year period, all of the comprehensive examinations merely must be passed again. (Exhibit 22)ah

    k. The administrator goes on to say that assistance was available only for your (Plaintiff's) dairy dissertation, something the administration was notified was no longer possible. (Exhibits 21, 17)

l. Plaintiff again receives police visits but this time he is arrested for being in his office. Plaintiff allegess he was told to remain there by a MSU grievance officer and was arrested merely for being present.

m. Plaintiff is not assigned an attorney. He is unable to obtain discovery, documents or witnesses, and is convicted. (Exhibit 23)ab

11. **1999.** Plaintiff becomes a professor at Lansing Community College. Popular with the students, he makes Continuing Contract (analogous to tenure) and never receives a complaint.

12. **2001**. Plaintiff files a EEOC complaint against MSU. He is immediately told, in front of witnesses, that his accounting professorship was to be terminated because of this complaint. (Exhibit 24)

13. **2004**. Plaintiff files a lawsuit against MSU. The Educational component is not included in the law suit.(Exhibit 25)ab

14. **2006.** Frustrated with inactivity from his Union, Plaintiff files a Department of Civil Rights complaint claiming LCC has reduced his hours and his harassing him because of his past Civil Rights complaint against MSU. (Exhibit 26)

a) Plaintiff is immediately suspended without due process. (Exhibit 27)

b) The Campus police once again are called to visit Plaintiff who fortunately was not present. (Exhibit 28)

15. **2007.** Plaintiff returns to MSU to try to remedy things.

1) MSU professor Michelle Kaminski interacted with Plaintiff to work on his Ph.D. (Exhibit 29). Plaintiff and her become involved as co-researchers in an official MSU research project (Exhibit 30) with the intentions of re-applying to his Ph.D. She backed out of the project stating she was told Plaintiff had no MSU affiliation. (Exhibit 31)

2) MSU Vice President and Professor. Keith Groty, MSU Law College Professor Mary Bedikian, and Professor Donald Power similarly worked on an official MSU project with Plaintiff with similar intentions. (Exhibit 31, 32)

   a) Defendant's General Counsel, Mike Kiley, called Dr. Groty to tell him that Plaintiff had no MSU affiliation. (Exhibit 33) The same rationale relayed by Dr. Kaminski.

   b) Mary Bedikian also was ordered by her administration to quit the project which was later taken away from her (Exhibit 34).

   c) Donald Power, untenured, was fired.

3) MSU Professor, Dr. Eduardo Guizar, found funding and had departmental approval to hire Plaintiff for a MSU research project (Exhibit 35). They apply for and are joint researchers on an official MSU research project (Exhibit 36).. He then told Plaintiff that he was no longer interested in the project as there was no money associated with it. (Exhibit 37) even after plaintiff showed him money was indeed available. (Exhibit 35)

4) Dr. Ruben Martinez refused to forward a grant stating $200,000 was not enough to run a project. (Exhibit 38)

16. **November 2007** Plaintiff submits a publication he constructed as an MSU student for Journal review to John Beghin.

**1)** Plaintiff is correctly addressed as Professor Gardner (professor at LCC) and it is forwarded to journal referees (Exhibit 39).

**2)** Plaintiff , now called merely Robert, is told his submission is being pulled from review. (Exhibit 40).

**3)** He expectedly denies Plaintiff's accusation that such an unprecedented move was politically motivated. Plaintiff outlines his supporting points, the unprecedented move, the change in titles, the rumor mill and the history of antagonism and threatens a Civil Rights complaint.(Exhibit 41)

2009 Graduate School Application.

1) Department Chair Steve Hansen suggests Plaintiff apply for graduate study. (Exhibit 42) He copies the e-mail to Scott Loveridge who also encouraged Plaintiff's application. (Exhibit 43)

A) Plaintiff provides the requisite paperwork. This includes a letter from the Canadian government asking Plaintiff to do research for them and an econometric paper he

wrote disputing a technique developed by professors at M.I.T. Plaintiff's econometric paper was accepted in an International Research Journal. (Exhibit 44) 44d

B) The Graduate Committee receives an anonymous note lobbying against Plaintiff's application. It brings up issues of 1999 and before. (Exhibit 45)

2) Defendant's lawyer indicates it came from their superior, Assistant Department Chair, Scott Loveridge (Exhibit 46)

3) Scott Loveridge was not on the faculty at that time the mentioned events occurred. (Exhibit 47) He either did not author the note or was given the information to produce the document.

4) Mr. Kiley is on record for discouraging support for Plaintiff's doctorate.(Exhibit 33) and was later implicated in conspiring with the State of Michigan in thwarting this application as discussed later.

C) Plaintiff's application is turned down as the department does not have the resources to sponsor Plaintiff's Ph.D.(Exhibit 48)

a) After Plaintiff files a Civil Rights complaint, Defendant's attorney's explanation is differs. (Exhibit 49)

i. Plaintiff's grades were declining.

ii. Plaintiff abandoned his dissertation research in 1999.

iii. Plaintiff flunked his preliminary examinations.

iv. Plaintiff has done no recent research.

v. E-mail correspondences between Steve Hanson, a Dr. Beghin and Plaintiff were unprofessional.

a) Defendant elicits an affidavit stating plaintiff's supervising professor, James Oehmke, has retired (i.e. a Professor Emeritus), inferring he is ineligible to supervise doctorates or sponsor employment. (Exhibit 50)

   i. Emeritus faculty are allowed to remain active post-retirement. (Exhibit 51)

   ii. Oehmke has stated he could finish Plaintiff's Ph.D. in a year if allowed (Exhibit 52)

III. The Current Complaint

Background

A) **April, 2011** Plaintiff approaches the Director of MSU's Native American Institute regarding a grant that he hopes the Director will sponsor to hire Plaintiff. Plaintiff mistakenly thought the director was George Cornell who had been replaced by Gordon Henry (Exhibit 53)a b c

1) Plaintiff alleges there a business agreement where Plaintiff would institute a native American Outreach program which Dr. Henry would compensate him with employment should they be successful in finding funding.

2) **May 17, 2011.** Dr. Henry and Plaintiff meet with the Chippewa tribe. (Exhibit 54)

a) The stated intention is to establish a "Farm initiative."

b) Dr. Henry entrusts Plaintiff to be the primary interaction with the Chippewa tribe administrator regarding the establishment of the Outreach Program

c) Henry indicates the is working with Plaintiff (who he introduces as being from MSU) to put together a few proposals for related USDA grants. 54b

3) **May 22, 2011**, Plaintiff drafts a proposed project outline for him and Dr. Henry to discuss with the Chippewa tribe (Exhibit 55)

4) **May 25**, Dr. Henry notifies Plaintiff of grant opportunities. (Exhibit 56)

5) **May 27.** Dr. Henry and Plaintiff meet with the Pokagon tribe. Plaintiff invoices him for 130 miles of travel which Plaintiff alleges Dr. Henry later reimburses. (Exhibit 57)

6) Dr. Henry and Plaintiff meet with the Pokagon Tribe administration regarding some related research. Dr. Henry gave Plaintiff the responsibility to answer some preliminary questions for the Pokagon Tribe. (Exhibit 58)

7) **July 14**, Dr. Henry and Plaintiff conduct a presentation to the Chippewa Tribe as a whole about developing tribal lands for agriculture use. It is well attended and draws much interest. (Exhibit 59)

8) **July 20,** Plaintiff notifies Dr. Henry that he has been offered $20,000 by the Bureau of Indian Affairs to fund their project should they be obtain a Tribal sponsor. Dr. Henry expresses interest.(Exhibit 60) *This is after meeting with the Pokagon tribe.* Plaintiff also notifies his supervising professor, James Oehmke, as they hope to include it in to finish his doctorate. (61)

9) Dr. Henry notifies Plaintiff that he has been successful in creating a position for him. However, he has been told not to include Plaintiff and to cut all relations. For legal reasons, he is now must post the position publically with a search committee charged with finding someone else.

i. Dr. Henry does not respond to Plaintiff regarding travel expenses he had compensated him for in the past and expresses no more interest in the BIA grant. (Exhibit 62).

ii. The search committee stated Plaintiff's outreach activities were "overstated". This had to be information gleaned from someone familiar with Plaintiff's work AND application. This lack of cultural competence is the reason Plaintiff is overlooked for an interview. They state Plaintiff's activities parallels the position description. (Exhibit 63)

Pokagon Project.,

1) July 28 Plaintiff contacted the Pokagon Indian tribe to inform them of funding provided by the Bureau of Indian Affairs. Mike Kasper is allocated by the tribe to work with Plaintiff and Oehmke (exhibit 64)

10) August 9 Plaintiff states his intention of using the project to fund Doctorate related research and is asked to make a presentation regarding the proposal. He meets with the Pokagon administration to present his proposal. (Exhibit 65)

11) The Pokagon tribe accept the proposal. Plaintiff works with several Tribe members to construct a proposal to their liking (Exhibit 66)

12) They submit a Tribal Resolution endorsing the proposal to hire Plaintiff and his supervising professor to conduct research intended to augment Plaintiffs Ph.D. application. They pledge support for the project. (Exhibit 67)

13) They had several meetings and a community meeting towards that ends (Exhibits 68). Plaintiff leases a computer to use on the project (Exhibit 68a-c)

14) Plaintiff maintains communication with Oehmke directs his research. (Exhibit 69)

15) In November, 2011, the Pokagon tribe called Plaintiff and told him that they were going to have another MSU entity take over the project. The BIA, who had promised the money and later support (Exhibit 70) similarly rescinded their support and would not respond to e-mails , phone calls or subpoenas from that point on.

16) **August, 2012.** MSU charges plaintiff $4000 for documents ($2000 down) requested under FOIA that would have allowed Plaintiff to be better suited to make the underlying claim.(Exhibit 71)

IV. Discussion

A. Plaintiff avers a claim of retaliation is justified. McDonnel Douglas, 411 US at 802, defines retaliation. There is no doubt that Plaintiff engaged is several protected activities, the Defendant knew about these activities, an adverse action occurred immediately afterwards Defendant argues there is no causal connection. Plaintiff disputes this.

1. Temporal proximity is a strong determinate of Causality. *Gorman_Bakos, 252 F.3d at 555 Historically, every civil rights complaint has been followed by adverse action.*

i) Plaintiff lost his financial aid immediately after filing the 1993 MDCR complaint (Exhibit 63)

ii) Plaintiff incurred harassing visits by MSU police after filing his 1997 Circuit Court complaint (Exhibits 13-14)

iii) Plaintiff lost his Community College professorship (Exhibit 24), had his Ph.D. terminated (Exhibit 20) and was arrested when Defendant was faced with the 2001 Civil Rights complaint.

iv) He was blackballed from MSU from that time onwards.

i) Michelle Kaminski, helping Plaintiff finish Ph.D. rescinded her efforts when told Plaintiff was not a member of MSU. (Exhibit 29,30,31)

ii) Mary Bedikian, working with Keith Groty to finish Plaintiff's doctorate and employ him, was told administratively to relinquish her interactions

with Plaintiff (Exhibit32-34). Keith Groty received a call from Defendant's attorney telling him Plaintiff was not a member of MSU (Exhibit 33), the same reasoning provided anonymously by Michele Kaminski.

iii) Eduardo Guizar, trying to help Plaintiff with employment, provided a pretextual excuse of no funding and quit interacting mysteriously with Plaintiff (Exhibit 35,36,37).

iv) In this instant suit, Gordon Henry reneged on efforts to compensate Plaintiff for Outreach activities Plaintiff constructed both by refusing to sponsor found funding and by publically posting a position Plaintiff was promised.

B. A Pattern of Antagonism Existed *Kachmar v Sungard Data Sys. Inc. 109 F.3d 1173, 177(3rd Circ, 1997) There is no doubt that Plaintiff has been through hell since filing his Civil Rights complaint in 1993 which promoted an affirmative action program for Latino Migrant Farmworkers. The filing of Circuit Court actions and the forced institution of his Migrant Farm Worker program in 2000, aggravated this antagonism.*

1) Defendant has always had her attorneys monitor his movements (Exhibit 5,33), dissuade supporters(exhibit) and provide pretextual responses to complaints as explained later..

2) Plaintiff lost all of his financial aid that MSU had control of and lost employment (Exhibit 3).

3) His initial doctorate ambitions have been upended with the misgrading of his comprehensive examinations (Exhibit 9), destruction of his research (exhibits 16a,17,19) , upending of his research endeavors and harassment of supporters (Exhibits.31,33,34)

4) He has been subject to unwarranted police visits (Exhibit13,28)

5) Attempts to walk away from MSU have been unsuccessful.

   i) He lost most of his LCC employment immediately after filing a Civil Rights complaint in 2001. (Exhibit 24)

   *ii) In keeping with this pattern, his employment contract with the Pokagon Indians was taken away from him (Exhibit 68).*

6) *Within MSU, numerous attempts at employment/education have been stymied administratively.*

i) *His recent Ph.D. application was upended administratively by a disparaging letter from the administration (exhibit 45)*

ii) *Attempts to finish his doctorate research upended with the appropriation of Plaintiff's contract with the Pokagon Tribe to other MSU entities. Exhibit 68*

7) Plaintiff's family has been involved. In a recent Circuit Court case against the State of Michigan,(Exhibit ).., the Judge found in favor of Plainitff.

i) She rejected the State of Michigan's claim that the State of Michigan did not Conspire to Retaliate with MSU in upending Plaintiff's Ph.D. progress and in garnishing Plaintiff's son's college account without due process. and to interfere with his Ph.D. application. (Exhibits 73 )

B) Disparate Treatment is proof of causality Weston v. Pa. 251 F.3d 420, 431 (3rd Cir. 1997)

A) Plaintiff was clearly a contending Ph.D. applicant.

i) Though Defendant was not able to produce Plaintiff's supervising professor's letter of support, earlier letters from him showed Plaintiff has maintained his research prowess and could finish in a year's time (Exhibit 52)

ii) Plaintiffs' ability to produce an Economic Letters Journal article, disputing econometric techniques developed at the Massachusetts Institute of Technology, is unheard of for a graduate student (Exhibits 44b-d).

iii) Retaliation can be inferred as playing a factor in rejecting Plaintiff's Ph.D. application.

B) Plaintiff was clearly a contending applicant for the Native American Institute position.

i) Plaintiff initiated two successful Native American Outreach projects showing cultural competency was NOT an issue.( Exhibit 55, 67)

ii) Plaintiff worked with a Native American tribe to get their endorsement to hire him as a researcher and obtain financing.(Exhibit 67)

C. Pretextual arguments. McDonnel Douglas, 411 US at 802, states that once Plaintiff makes the prima facie, the Defendant must offer a response. If that response is pretextual, the court may infer retaliation.

A) In Plaintiff's narrative, Plaintiff highlights two blatant pretextual allegations, 1997 police visits (Exhibit 14) and Plaintiff's 1999 Ph.D. termination (Exhibit 21-22) have been shown to be explained with pretextual reasons.

B) In his Motion, Defendant alleges Mr. Gardner's FIRST complaint of conspiracy dates to 1985. Defendant portrays this early complaint (Exhibit 74,p2), against Animal Science faculty, John Speicher and Roger Mellenberger, as being a separate issue from this instant action and presents it as an ad hominem attack.

   a) Defendant omits that the harassment complaint in question, was actually found in favor of plaintiff by internal grievance personal, and forwarded to Mr. Kiley's office of the MSU General Counsel for adjudication .(Exhibit 6).

   b) General Counsel refused to adjudicate a complaint against Speicher, an ex-administrator who is friends with Defendant Simon, enhancing a hostile environment that exists today and is included in Plaintiff's complaint.(Exhibit 7)

   c) This instant complaint DOES include these Animal Science Professors who have administrative connections and who interact with Defendant.

   i. (Exhibit 74, page 9 ,. "Defendant....assigned Karen Klomperans, working with John Speicher, a MSU professor with a long history of racial

complaints from plaintiff and other students, to interact with his Ph.D. This served to antagonize Plaintiff's department . . . "

ii. Count VI –Retaliatory Harassment (Exhibit 74, page 18) "They had no business having / allowing agents (in this case Roger Mellenberger) to interact with Plaintiff's elderly parents in order to monitor his activities".

C) Defendant claims that Plaintiff had no (MSU) institutional affiliation since 1998. However, Plaintiff has already presented three official documents listing him as co-researcher on three official MSU research projects. (Exhibits 74 p3 top ). This also highlights an antagonism in that Defendant denies the obvious.

D) In Defendant's denial of Plaintiff's 2008 PhD application, the original reason given was a lack of resources to help Plaintiff obtain his Ph.D.(Exhibit 48)

i) This was a pretext as Plaintiff came with his own funding (employment) and supervising retired professor (No salary or other obligations) who supported the Ph.D. (Exhibit). Despite defendant's insinuation to the contrary, retired professors are able to continue teaching (Exhbit 51)

ii) Furthermore, if there had been no doctoral resources available, Plaintiff would not have been encouraged to apply.

iii) In response to this instant complaint, Defendant alleges Plaintiff abandoned his research.

a) Plaintiff had filed a Civil Rights complaint asking for his Ph.D. progress to be reinstated, which was rejected by Defendant. (Exhibit 11 ).

b) His Supervising professor similarly filed an internal complaint(Exh 16)

c) It was well established that Plaintiff's data was destroyed ( EX 17,19; yet, Defendant insisted Plaintiff continue his research using this erased data, an impossible feat.(Exhibit 18,21)

d) He alleges Plaintiff flunked his preliminary examinations. Though this was true, it was also made clear to the Department that these examinations were misgraded. (Exhibit 9)

e) Defendant DOES NOT mention that the 2009 admissions committee had been lobbied by an administrator. (Exhibit 45)

f) Defendant's later claims that Plaintiff's allegations of discrimination to a Journal referee and MSU was reason to deny Plaintiff's application.

i. Hansen encouraged Plaintiff's application (Exhibit 42) knowing firsthand what had transpired between Dr. Beghin, himself and Plaintiff. Obviously, this was not enough of an issue for Dr. Hansen to avoid encouraging Plaintiff's application.

ii. Plaintiff alleges Defendant's claim is a clear cut action of retaliation to a threatened Civil Rights action in itself.

E) In regards to Plaintiff's interactions with Dr. Henry

1) Defendant states that in 2011, about a dozen people gathered at MSU's campus for lunch to discus, garner(ing) support from the Bureau of Indian Affairs (Exhibit).

i) This is not true, Plaintiff ONLY was offered the funding who alone pursued it.

ii) The funding was offered July 27 (exhibit 58) only AFTER the May 27 meeting (Exhibit 57).

2) Defendant states Dr. Henry was troubled by Plaintiff's presuming to speak for MSU in the course of dealing with the BIA (Exhibit 74, bottom).

i) This is not true, as Henry has introduced Plaintiff as being from MSU to the tribes (exhibit 54b),

ii) Henry gave Plaintiff leadership in interacting with tribes on their project (Exhibit 54a)

iii) Henry actually was interested in the BIA grant After the Pokagon meeting (exhibit 60).

3) Defendant denies that Plaintiff had expectancy that he would receive employment financing from the Bureau of Indian Affairs if he established a written agreement with the tribe.

i) The request for proposal clearly delineated that a University consultant be hired. (Exhibit 76)

ii) The proposal submitted by the tribe specifically outlined Plaintiff's employment (Exhibit 67, Staff) who actually employed (Exhibit 77), Plaintiff for a couple months but never compensated him.

4) Defendant insinuates his criminal prosecution of Plaintiff precludes him from employment but offers no evidence of such a policy.( Exhibit 74 p5) Plaintiff dismisses this as speculative and another ad hominem attack.

5) Defendant claims that no funding became available to Dr. Henry. (Exhibit)

a) Dr. Henry was notified about and expressed interest in the BIA funding (Exhibit)

b) MSU funding for a position mimicking Plaintiff's efforts but was not allowed to offer it to Plaintiff.

6) Defendant claims there is no casual connection between Plaintiff's complaints and the denial of his MSU employment by the search committee.

a) It is not the search committee that is on trial here, it is Defendant Simon working through her agents.

b) It was Defendant that decided to post the position publically instead of offering it to Plaintiff.(Exhibit 78)

c) The committee's concerns about Plaintiff's lack of cultural competence was based on their statement Plaintiff "overstated" work with the Native American population (Exhibit 63b). "Overstated" implies a comparison between Plaintiff's claims and what he actually accomplished. This infers outside

interactions by someone the committee respected (like an administrator) and who had access to Plaintiff's application and knew of his related work. A pattern of negative interventions becomes apparent given to the Departmental Ph.D. admission's committee (Exhibit 45) and the message relayed to Dr. Groty trying to help plaintiff (Exhibit 33).

The list goes on as illustrated in Plaintiff's beginning narrative.

C) Is Simon a person under Civil Rights Act.

There is a preponderance of evidence showing that Plaintiff is subject to an antagonist that has blackballed Plaintiff from MSU. Someone with the authority to allocate lawyers to monitor Plaintiff, to order administrators from all areas of the University to not work with Plaintiff, to have her police harass and file false reports to discredit Plaintiff. There is only person with such a motive, a Civil Rights complaint that could endanger her own career.

Defendant's claims she has heard nothing from Plaintiff in the last several years has been shown to be false as was discussed in the earlier related motion.

D) Plaintiff's claims his Tortious Interference with and Breech of Contracts claims are with merit. Plaintiff never stated a written contract ever existed with MSU. Tortious interference and contractual claims includes any kind of business expectancy.

1) Plaintiff came to Dr. Henry with an offer, he would provide his experience in establishing outreach agendas (Exhibit 53 a,b). In turn, Dr. Henry would work with Plaintiff to employ him. Henry clearly knew that Plaintiff's efforts in establishing an outreach agenda for him was that he expected employment in turn.

a) Henry acknowledged this by clearly stating his intentions of pursuing funding for Plaintiff (Exhibit 54b).

b) He provided money for travel, introductions to Tribal leaders, Grant Requests to apply for. (Exhibit 54b)

c) Dr. Henry knew the deal, i.e. there was an offer and acceptance.

2) There was reasonable certainty that Plaintiff was going to get the funding.

a) The Bureau of Indian Affairs had promised the funding that was to be used for employment. and actually came through with the money.

b) Dr. Henry sought and obtained funding for a position that mirrored Plaintiff's efforts.

3) Dr. Henry breached the contract when he would not accept the funding promised by the BIA and when he opened the position to the public.

E) Plaintiff obtained money for the Pokagon Tribe who agreed to use the money to fund his employment research.

1) They worked with Plaintiff to submit a successful grant proposal listing him as the employee they intended to hire, *a contract.* (Exhibit 64,65,67).

2) They actually had plaintiff conduct work under the contract (Exhibit).

3) They breeched the contract when they dismissed Plaintiff to give the project to other MSU entities (Exhibit 68).

4) *Defendant knew about the contract.* The Pokagon would have surely told them of such when MSU first interacted with them.

*5) Defendant intentionally procured the contract breach.*

i) *They were not authorized to do so*, especially given the federal laws and university policy (Exhibit 76) prohibiting plagiarism in research.

ii) *They had motive in* that they wanted the funding for themselves.

iii) *The relations between parties inferred an interference* given the constant antagonism held toward plaintiff. Parties were rewarded with administrative support and attention via legal services for taking antagonistic actions against Plaintiff.

iv) Given that *Defendant did take over the contract* afterwards also provides proof of interference. (Exh 68)

v) Furthermore, the *Bureau of Indian Affairs similarly withdrew promised support* indicating further interactions to interfere with the contract.(Exhibit 70)

6) *There was no justification.* Defendant merely speculates that Plaintiff must have made a bad impression with the Pokagon who then no longer wished to work with him; something that the positive/non-negative interactions between Plaintiff and the tribe does not support.

7) As a result *Plaintiff incurred damages* as, once again, his Ph.D. progress was interrupted and he was not privy to the grant money promised.

Defendant does not discuss the Retaliatory Conspiracy charges so Plaintiff does not respond beyond pointing out that the Bureau of Indian Affairs similarly withdrew support timed with the Pokagon termination of Plaintiff's duties.

$4000 is an astronomical fee for any FOIA request (Exhibit 71. It was obviously meant to discourage plaintiff from pursuing this complaint. Plaintiff asks that this not be dismissed.

Discussion:

In summary, Plaintiff is trying to get his life back. He has successfully won a Circuit Course case that implicated Defendant of Retaliatory Conspiracy in the taking of his son's college money with no due process as well as in upending an attempt by Plaintiff's department to allow Plaintiff an opportunity to obtain his Doctorate.

Plaintiff beseeches the Court to deny this Motion and allow the case to go forward.

**Robert Gardner** **November 6, 2013**